Filed 4/24/15  In re L.C. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re L.C., et al., Persons Coming Under the Juvenile Court Law. | |
| CONTRA COSTA COUNTY BUREAU OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>D.C., et al.,<br><br>        Defendants and Appellants. | A142376<br><br>(Contra Costa County<br>Super. Ct. Nos. J12-00992, J12-00993, J13-01010) |

L.J. (mother) and D.C. (father) appeal from juvenile court orders terminating their parental rights to their daughter, four-year-old L.D.C. (sister), and their sons, three-year-old D.C., Jr. (older brother) and one-year-old L.C. (younger brother).  Mother argues that the order terminating her parental rights to sister was improper because she was entitled to the beneficial-relationship exception to termination.  Father argues that all three orders terminating his parental rights must be reversed because (1) the requirements of the Indian Child Welfare Act (ICWA) and related state laws were not satisfied; (2) the proceedings failed to adhere to the "statutory framework" of Welfare and Institutions

1

Code[1] section 300 et sequitur, and he was given improper notice of the selection-and-implementation hearing under section 366.26 (section 366.26 hearing); and (3) the court had a sua sponte duty to appoint a guardian ad litem for him.  He also claims his trial counsel rendered ineffective assistance of counsel.[2]  We reject all these claims and affirm.

I.
FACTUAL AND PROCEDURAL
BACKGROUND

In May 2012, the Contra Costa County Children & Family Services Bureau (Bureau) received a report that mother, who was living in a domestic violence shelter with the two older children, had left sister, who was then almost two years old, unattended "in a bathtub full of water for [10 to 15 minutes] while she answered a phone call out of the room."  In mid-June, after mother failed to attend a meeting with the social worker, the social worker went to the motel where mother was staying and spoke to two women who said they were friends with mother.  The friends reported that mother had retrieved sister and older brother from father and had then left them at the motel the previous night in the care of one of the friends.  At approximately 1 a.m., while mother was still gone, father came to the room and "was banging on the door, shouting and 'acting a fool.'  He appeared to be high on methamphetamine.  He was yelling, screaming[,] and threatening to blow up the motel . . . [and] seemed so out of control[,] . . . like 'a devil.' "  Father picked up ten-month-old older brother and "was swinging [him] from [his] legs in a swooping/swinging motion."  The friends were unable to prevent father from taking the children, and the police stated they could not help because father's address and phone number were unknown.

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise noted.

[2] Father raised similar issues in two other appeals we recently decided, one involving a paternal half sister (*In re D.C.* (Jan. 29, 2015, A141365) [nonpub. opn.]) (half sister) and one involving a paternal half brother (*In re D.C.* (Mar. 27, 2015, A141989) [nonpub. opn.]) (half brother).  Much of our discussion of father's claims is drawn from the opinions in those cases.

2

Two days later, while the two children were still missing, the Bureau filed juvenile dependency petitions for them, alleging jurisdiction under section 300, subdivision (b) (failure to protect)—based on the bathtub incident, the motel incident, father's substance abuse, and both parents' homelessness and inability to provide for the children—and under subdivision (g) (no provision for support) because the parents' and children's whereabouts were unknown. The children were soon located and placed in foster care, and the juvenile court ordered them detained.

At an August 2012 jurisdictional hearing, mother admitted to an amended allegation that she "ha[d] been unable to provide the children with adequate care, supervision, and protection[,] . . . plac[ing] the children at risk of harm." Jurisdiction as to father, who had not yet been appointed counsel, remained pending. The juvenile court found sister and older brother to be children described by section 300, subdivision (b).

At an October 2012 hearing, father was declared the presumed father of both children. He had not requested visitation, however, and was soon arrested for violating parole and jailed. Meanwhile, mother, who had temporarily moved to San Joaquin County, visited the children consistently.

In December 2012, the Bureau filed subsequent petitions under section 342 for sister and older brother alleging jurisdiction as to father under section 300, subdivision (b) (failure to protect) based on the motel incident and father's substance abuse and under subdivision (j) (abuse of sibling) based on half sister's dependency case, which involved father's domestic violence against that child's mother. The next month, the juvenile court dismissed the original petitions' remaining allegations against father and found the allegations in the subsequent petitions true. It also ordered reunification services for both parents, continued visitation for mother,[3] and ordered visitation for father, to begin once he requested it.

---

[3] The juvenile court had previously entered dispositional orders as to mother only, but it vacated those orders after recognizing that only one dispositional order per child should be entered.

3

Mother made progress on her case plan by, among other things, completing a parenting education program, participating in a domestic violence program, and beginning individual therapy. She also continued to visit with sister and older brother. Father, who was released from prison in early June 2013, did not stay in touch with the Bureau and did not show any progress on his case plan or request visits with the children. An August 2013 status-review report recommended that mother's services be continued and father's services be terminated. At a hearing later that month, the juvenile court ordered mother's services continued. After a contested hearing in September at which father testified, the court terminated his services, although it permitted him to have monthly supervised visits.

In June, mother had given birth to younger brother, who was "medically fragile" and required regular medication for seizures. The social worker in the older children's cases repeatedly told mother not to leave the baby with father. When younger brother was two months old, however, father brought him to a court hearing in half brother's case, and younger brother was detained and placed with his two siblings.

At the end of August 2013, the Bureau filed a juvenile dependency petition for younger brother alleging jurisdiction under section 300, subdivision (b) (failure to protect) based on father's domestic violence and drug use, father's failure to engage in reunification services in half sister's case, and mother's placement of younger brother in father's care despite being told unsupervised visits should not occur. Jurisdiction was also alleged under section 300, subdivision (j) (abuse of sibling) based on father's failure to engage in reunification services in half sister's case. At a November 2013 hearing, mother pleaded no contest to the allegation that she "placed [younger brother] at serious risk by leaving the child in the care of the father, in that the child's father has an ongoing substance abuse issue." No jurisdictional findings were ever made as to father, who remained an alleged father throughout younger brother's case. The next month, the juvenile court ordered that no visitation between father and younger brother occur based on a finding of detriment.

4

A December 2013 status-review report filed in the two older children's cases recounted the circumstances surrounding younger brother's detention, highlighting mother's "susceptibility" to father and willingness to put younger brother at risk by leaving him in father's care. Mother was visiting only once a month with the two older children and had failed to continue individual therapy. The report observed that although mother "ha[d] completed the majority of her case plan goals, it seem[ed] that she ha[d] only gone through the motions . . . [and] clearly ha[d] no understanding of why [the Bureau] became involved with her family." The report recommended terminating mother's reunification services and setting a section 366.26 hearing for the two older children.

Mother opposed the termination of her services, and she and the social worker testified at a January 2014 hearing on the issue. According to the social worker, mother left younger brother with father many times, despite the social worker's repeatedly cautioning her not to do so. Mother, on the other hand, testified that she had left the baby in father's care only once and had done so only because of circumstances outside her control. At the conclusion of the hearing, the juvenile court found that the social worker was credible and mother was not. It also characterized father as "a violent, vicious, out-of-control man . . . [who] should not have contact with the children." As to the two older children, the court found that reasonable services had been provided to mother, terminated her services, and set a section 366.26 hearing. Mother was permitted to have supervised visits with them once a month. The next month, the court adopted the Bureau's recommendation that no services be provided to the parents in younger brother's case and set a section 366.26 hearing for younger brother as well.

In May 2014, mother filed section 388 petitions seeking extension of her reunification services for the two older children. At a hearing on the petitions, mother testified that she was receiving individual therapy again, that she had been consistently visiting the children, and that she had not known about father's domestic violence or ongoing substance abuse when she left younger brother with him and that lying to the social worker about the number of times he took the child had been a mistake. In

5

contrast, the social worker testified that she had discussed father's domestic violence and drug problems with mother and had repeatedly told her to keep younger brother away from father. The juvenile court denied the petition, finding that mother continued to be not credible and that there had not "been a significant change of circumstances." It suspended her visitation and continued the section 366.26 hearing to the next month so that father, who had recently been incarcerated again, could attend.

A section 366.26 hearing for all three children was held at the end of June 2014. Father did not appear despite having been ordered to do so at a hearing held four days before, and the juvenile court denied his request for a continuance based on his claim that he did not have enough money to take public transportation to court. His trial counsel objected to the termination of his parental rights but did not submit any evidence. Mother appeared and argued that her parental rights to all three children should not be terminated based on the strength of her bond with them as demonstrated in the Bureau's reports. The court terminated mother's and father's parental rights after finding that the children were adoptable and their relationship with mother did not preclude termination.

## II.
### DISCUSSION

A. *The Juvenile Court Correctly Determined that Mother Failed to Establish the Beneficial-Relationship Exception to Termination of Parental Rights.*

Mother argues the juvenile court erred by terminating her parental rights to sister, relying on the statutory exception that applies when there is "a compelling reason for determining that termination would be detrimental to the child" because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship" (the beneficial-relationship exception). (§ 366.26, subd. (c)(1)(B)(i).) We disagree.

Between June 2012, when sister was removed, and August 2013, mother was permitted to have twice-monthly, supervised visits with sister. Throughout this period, mother visited about a dozen times. She cancelled one visit because she had a doctor's appointment, two visits because she had court the same day, three more because of

6

younger brother's birth and medical needs, and another one because she failed to confirm it in advance.

At the August 2013 hearing, the juvenile court gave the Bureau authority to allow mother to have unsupervised, overnight visitation for up to 30 days. The Bureau never exercised that authority, however, because of the events surrounding younger brother's removal. From September through December 2013, mother appeared for only two visits, and several others were cancelled due to her responsibilities for younger brother, her own illness, and her failure to show up or confirm in advance. At the December 2013 hearing, the court ordered supervised visits reduced to once a month. Mother visited with the children a few more times but missed the April 2014 visit because she failed to confirm it. The court suspended her visitation in May 2014.

During all the visits she attended, mother was affectionate, played with sister, and otherwise behaved appropriately. She helped sister interact with older brother, helped sister use the restroom, and brought food and gifts. At the end of some visits, sister expressed reluctance to leave. For example, at the December 2013 visit, she "told . . . mother on two occasions[,] 'I want to go home with you now.' " At the January 2014 visit, sister told mother, " 'I love you mommy,' " and at the March 2014 visit, sister "asked . . . mother if she could go to her house." Summarizing the visitation history in the section 366.26 report, the social worker concluded that sister "does have a relationship with . . . mother, but the relationship does not outweigh the benefits of legal permanency for the child."

At the section 366.26 hearing, mother argued that the benefit to all three children from an ongoing relationship with her outweighed the benefit of legal permanence, emphasizing that visitation went well and that she had a "close bond" with them, particularly sister. After hearing argument from the other parties, the juvenile court ruled that mother had not established the beneficial-relationship exception. The court explained its reasoning at length:

> "I do not find the relationship with [sister] to be that strong. . . . [O]ne of
> the things that struck me . . . [is that] the visit for April [2014] did not

7

occur . . . because mother did not call to confirm the visit. She had visited them approximately once per month since July 2012. Even when she was offered more frequent visits, she didn't take advantage of it. And on several occasions, . . . mother missed visits and did not see the children for over one month.

. . . . .

Half of [sister's] life, she's been in this home with these caretakers, so I don't know what you are all talking about, a bond.

I think . . . her mother is a very nice lady, probably, and [sister] enjoys visiting with her, and I'll bet she's lovely with her, but that doesn't give a parental bond. That doesn't do the day-to-day caring.

The real issue here is mother is not credible, has very poor judgment, and I don't feel the children are safe in her care. That is the real big issue. I think that there [are] always . . . some incidental benefits from a visit, but they certainly do not outweigh the benefits of [the current] home, where [sister] has been for half of her life, and where [younger brother] has been for all of his life and [older brother] for almost all of his life. I don't . . . even understand what you are all talking about, on how strong that is, because I simply do not see it.

There is always an interaction between a natural parent and child. It will incur some incidental benefit, but the significant attachment is certainly the attachment that the children have with the caretakers.

And, also, I don't find that the relationship of visitation is so very important to the children. I think it's nice. I think it's been a nice little visit, but I don't think . . . in any way . . . that the children's need for permanency should be outweighed by this occasional visitation.

. . . .

I think it's sad. It's always heartbreaking because I think . . . mother is not a bad person. Sometimes we have bad people, and it's not sad. This mother is not a bad person and, frankly, she's had a heck of a growing up herself, and I think that's even more heartbreaking, knowing how difficult her own growing up was . . . .

But then I have to look to the safety of her children and their best interests, and their best interests are [staying] in [their current] home with

the stability and love and nurturing and safety that they have, so I am going to follow the [Bureau's] recommendations."

Once a juvenile court has determined a child is adoptable by clear and convincing evidence, it "must terminate parental rights and free the child for adoption" unless a statutory exception, such as the beneficial-relationship exception, applies. (*In re Jason J.* (2009) 175 Cal.App.4th 922, 936; § 366.26, subd. (c)(1).) A parent seeking to show the beneficial-relationship exception applies has the burden to establish two prongs: "regular visitation" and "benefit to the minor[] . . . that outweigh[s] the benefits of adoption." (*In re I.R.* (2014) 226 Cal.App.4th 201, 212; *Jason J.*, at p. 936.)

Courts of Appeal have reviewed determinations about the applicability of the beneficial-relationship exception for substantial evidence, abuse of discretion, or a combination of both. (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1166, fn. 7 [discussing cases].) Here, the parties do not ask us to decide which standard of review applies, and we conclude the juvenile court's determination was proper under either. (See *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351 ["practical differences between" substantial-evidence standard and abuse-of-discretion standard "are not significant"].)

The visitation prong requires a showing that the parent "visit[ed] consistently and to the extent permitted by court orders." (*In re I.R.*, *supra*, 226 Cal.App.4th at p. 212.) The juvenile court explicitly found that mother had failed to visit the children as often as she could have, and she does not challenge this finding. Indeed, although mother was permitted twice-monthly visitation from June 2012 to December 2013, she averaged only one visit per month. And although some of the visits she missed were excusable based on her own and younger brother's medical issues, mother missed several visits without providing a valid excuse. Finally, in August 2013 mother was given the opportunity to begin unsupervised and overnight visits, but she failed to take advantage of it because she made the poor decision to leave younger brother in father's care. In sum, the court correctly found that mother failed to visit with the children as often as permitted, and that finding alone is fatal to her claim. (*Ibid.*)

9

The juvenile court's finding that mother's bond with sister was not sufficiently strong was also proper. "The 'benefit' prong of the [beneficial-relationship] exception requires the parent to prove his or her relationship with the child 'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.' " (*In re K.P.* (2012) 203 Cal.App.4th 614, 621, quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) "The factors to be considered when looking for whether a relationship is important and beneficial are: (1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the positive or negative effect of interaction between the parent and the child, and (4) the child's particular needs." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 467, fn. omitted.)

" ' "Interaction between [a] natural parent and child will always confer some incidental benefit to the child,' ' " and "[i]t is not enough to show that the parent and child have a friendly and loving relationship." (*In re J.C.* (2014) 226 Cal.App.4th 503, 529.) Instead, a parent must establish that he or she " 'occup[ies] "a parental role" in the child's life,' " a " 'relationship [that] characteristically aris[es] from day-to-day interaction, companionship[,] and shared experiences.' " (*In re K.P.*, *supra*, 203 Cal.App.4th at p. 621.) " '[B]ecause a section 366.26 hearing occurs only after the [juvenile] court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement.' " (*Ibid.*)

Initially, mother argues the statutory language has been incorrectly interpreted to "requir[e] the benefit of the parental relationship to <u>outweigh</u> the benefits of adoption." (Underlining in original.) She states that "benefit" means " 'anything contributing to an improvement or advantage,' " apparently arguing that the exception exists as long as a child derives *some* benefit from a relationship with the parent. Her position ignores the full provision, however, which requires termination of parental rights unless it would be "detrimental" to the child. (§ 366.26, subd. (c)(1)(B).) Termination is detrimental only if the benefit to the child from maintaining the relationship with the parent is greater than

10

the benefit from being adopted.[4]  We therefore reject mother's interpretation of the statute and decline to depart from well-settled precedent on the issue.

In her briefing, mother recounts the details of the many positive visits she had with sister.  She argues that they demonstrate she "occupied a parental role with [sister]" because she did things a mere " 'friendly visitor' " would not (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 573), including helping sister use the toilet and correcting her misbehavior.  But taking a parental role at visits is not enough.  In the primary decision mother relies on, *In re S.B.* (2008) 164 Cal.App.4th 289, the Court of Appeal reversed an order terminating parental rights where the record showed the father "continued [a] significant parent-child relationship" with his daughter, whom he consistently visited two to three times a week, "despite the lack of day-to-day contact with [her] after she was removed from his care." (*Id.* at pp. 293-295, 299, italics omitted.)  Here, in contrast, mother visited sister only approximately once a month throughout the case and did not take advantage of the opportunity to have more frequent visits or to progress to unsupervised visits.  We agree with the juvenile court that occasional, pleasant visits do not establish the requisite parent-child bond.

Mother also argues that "[t]he mother-child relationship . . ., coupled with [sister]'s repeated desire to live with . . . mother, present[ed] a compelling reason for finding that termination of . . . mother's parental rights [would be] detrimental."  But the case she cites, *In re Scott B.* (2010) 188 Cal.App.4th 452, involved a much older, emotionally unstable child who "had spent nearly all of his life living with [his m]other," had "consistent weekly visits with her," and had "repeated[ly] insiste[d] that his preference would be to live with [his m]other." (*Id.* at p. 471.)  Here, while sister expressed a desire to stay with mother on a few occasions and sometimes had difficulty ending visits, she adjusted well to her foster placement, which she had been in for two

---

[4] Mother also suggests that comparing the benefit of the relationship with a parent to the benefit of adoption "is not possible because the actual benefit[] of adoption . . . is, in the end, unknowable," given that adoption may be traumatic in some ways.  We do not believe juvenile courts must be prescient to assess the impact adoption is likely to have on a child.

years when parental rights were terminated, and never expressed a level of wanting to return to mother even approaching that displayed in *Scott B.*

In any event, as we discussed above, whatever benefit sister derived from her relationship with mother ultimately had to be balanced against the benefit sister would derive from adoption. Even if we accept mother's position that sister had a "significant, positive relationship" with mother, the record does not demonstrate that the relationship was strong enough to prevent termination of mother's parental rights, particularly given sister's young age and her bond with her prospective adoptive family. The juvenile court did not err by concluding the beneficial-relationship exception was inapplicable.

>B. *The Juvenile Court's Failure to Determine Whether ICWA Applies Was Harmless Because Father Did Not Provide Information in These Children's Cases Indicating He Might Have Indian Heritage.*

Father argues the orders terminating his parental rights to all three children must be conditionally reversed because the juvenile court and the Bureau failed to comply with ICWA-related requirements. We conclude the court erred by not making an express or implied finding whether ICWA applies but that the error was harmless.

None of the information provided in these three children's cases suggested that they might be Indian children. On August 10, 2012, father completed and filed in the two older children's cases an ICWA-020 form, "Parental Notification of Indian Status," in which he checked the box indicating he is not aware of having any Indian ancestry. At a hearing on the same date, father responded "No" when the juvenile court asked him whether he had any Indian ancestry. Finally, the petition for younger brother filed in August 2013 included an ICWA-010(A) form, "Indian Child Inquiry Attachment," stating that an ICWA inquiry had been made and that "[t]he child has no known Indian ancestry."[5] No additional ICWA-related information about father was provided in any of

---

[5] The October 2012 disposition report for the two older children states that the previous month, mother had "stated to th[e] social worker that she does not have Indian Ancestry." Father does not rely on any potential Indian heritage of mother's in making his claim.

12

the Bureau's reports, and the court never made any ICWA-related findings or orders or mentioned ICWA issues again in any of the three cases.

In December 2012, however, the Bureau filed a request for judicial notice of "[a]ll orders and findings" in half sister's case. At a hearing later that month, the juvenile court took judicial notice of "the half sibling file," which it indicated it had before it. As discussed in our previous opinion involving half sister, father provided conflicting information about Indian heritage in that case. Although father apparently told the social worker on at least one occasion that half sister did not have Indian heritage, on August 29, 2012, he completed and filed an ICWA-020 form in which he checked the following three boxes: (1) "I am or may be a member of, or eligible for membership in, a federally recognized Indian tribe"; (2) "I may have Indian ancestry"; and (3) "The child is or may be a member of, or eligible for membership in, a federally recognized Indian tribe." In addition, the November 2012 disposition report in that case stated that father said he "believe[d] that he has American Indian Ancestry on his father's side," although father also reported that "[h]e never knew his father and only met him once."

The purpose of ICWA is "to protect the best interests of Indian children and to promote the stability and security of Indian tribes." (25 U.S.C. § 1902.) "ICWA presumes it is in the best interests of the child to retain tribal ties and cultural heritage and in the interest of the tribe to preserve its future generations, a most important resource." (*In re Desiree F.* (2000) 83 Cal.App.4th 460, 469.) To further these goals, tribes are entitled to take exclusive jurisdiction over or intervene in state dependency proceedings involving Indian children. (25 U.S.C. § 1911(a) & (c).) "Because [a] tribe's right to assert jurisdiction over . . . or to intervene in such proceedings would be meaningless if the tribe has no notice that the action is pending," ICWA requires notice "where the [juvenile] court knows or has reason to know that an Indian child is involved." (25 U.S.C. § 1912(a); *In re B.R.* (2009) 176 Cal.App.4th 773, 780; see § 224.2; Cal. Rules of Court, rule 5.481(b).[6])

---

[6] All further rule references are to the California Rules of Court.

State law also imposes on both the juvenile court and the county welfare agency "an affirmative duty to inquire whether a dependent child is or may be an Indian child." (*In re Nikki R.* (2003) 106 Cal.App.4th 844, 848; § 224.3, subd. (a); rule 5.481(a).) If the agency or the court "knows or has reason to know that an Indian child is involved, the social worker . . . is required to make further inquiry regarding the possible Indian status of the child" to facilitate the provision of notice. (§ 224.3, subd. (c); see also *In re Alice M.* (2008) 161 Cal.App.4th 1189, 1200.) An "Indian child" is any unmarried minor who "is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4).) Among the circumstances that "may provide reason to know that the child is an Indian child" is when a relative "provides information suggesting the child is a member of a tribe or eligible for membership in a tribe or one or more of the child's biological parents, grandparents, or great-grandparents are or were a member of a tribe." (§ 224.3, subd. (b)(1); see also rule 5.481(a)(5).)

As in both half sister's and half brother's cases, the juvenile court failed to determine in the first instance whether ICWA applies to any of these three children's cases. Although a juvenile court is not "required to make an *express* finding that ICWA [does] not apply[,] . . . the record must reflect that the court considered the issue" and has at least *implicitly* so found. (*In re Asia L.* (2003) 107 Cal.App.4th 498, 506, italics added; *In re Antoinette S.* (2002) 104 Cal.App.4th 1401, 1413.) The court here made no express finding about ICWA's applicability, and once again we are unable to conclude that it made an implied finding. The only distinction between this case and the half siblings' cases regarding the consideration of ICWA's applicability is that here the court specifically asked father whether he had Indian heritage. We disagree with the Bureau's suggestion that this exchange establishes that an implied finding was made. Even assuming it might otherwise have sufficed, the information indicating mother had no Indian heritage, on which any determination that ICWA was inapplicable would have depended, was not provided until later.

14

Having concluded that the juvenile court's failure to make an express or implied ICWA finding constituted error, we turn to consider whether the error was harmless. In younger brother's case, it clearly was. Father remained an alleged father throughout the proceedings, and "an alleged father's claims of Indian heritage" do not trigger ICWA-related notice or inquiry requirements because "absent a biological connection, [a] child cannot claim Indian heritage through [such a] father." (*In re E.G.* (2009) 170 Cal.App.4th 1530, 1533.) Indeed, father concedes that his ICWA claim fails as to younger brother if we reject his claim that the juvenile court erred in relation to his paternity status, which we do in part II.C. of this opinion.

We also conclude that the juvenile court's failure to make an express or implied ICWA finding was harmless in the two older children's cases, although we acknowledge that it is a closer call. Reversal is not required when a juvenile court fails to comply with ICWA and related state laws but a parent does not represent that he or she has Indian heritage. (See, e.g., *In re N.E.* (2008) 160 Cal.App.4th 766, 769-770; *In re Rebecca R.* (2006) 143 Cal.App.4th 1426, 1430-1431.) Here, father said he did not have Indian heritage both in writing, on the ICWA-020 form filed in the two older children's cases, and orally, in response to the court's questions. As a result, whether the error was harmless depends on the effect of the record from half sister's case, which was judicially noticed in the older children's cases. In half sister's case, the ICWA-020 form and a November 2012 report provided information that raised the possibility that father's children might be Indian children. (See *In re Gabriel G.* (2012) 206 Cal.App.4th 1160, 1167-1168 [court and agency have duty to inquire further when parent provides conflicting information about Indian heritage].)

Initially, the Bureau argues that the ICWA-020 form and the November 2012 report in half sister's case were not encompassed in the juvenile court's judicial-notice ruling because the Bureau's written request for judicial notice asked the juvenile court to take judicial notice of the "orders and findings" in half sister's case. But at the hearing, the Bureau clarified it was "requesting judicial notice of . . . [¶] . . . [t]he half sibling file," and the court specifically granted that request. And, contrary to the Bureau's position,

the court could properly take judicial notice of the documents filed in half sister's case. (Evid. Code, § 452, subd. (d) ["[r]ecords of . . . any court of this state" proper subjects of judicial notice]; see, e.g., *In re Z.N.* (2009) 181 Cal.App.4th 282, 298-299 [taking judicial notice of tribal ICWA notices filed in half siblings' cases].) As a result, we conclude the two documents are part of the record in the two older children's cases.[7]

But that conclusion does not end our analysis. We agree with the Bureau that neither it nor the juvenile court was required to "page through" the entire judicially noticed record of half sister's case for additional ICWA-related information, especially since the request for judicial notice had nothing to do with ICWA issues and father never hinted that any different ICWA information existed in half sister's file. Courts and county welfare agencies do not have a duty to act upon information about Indian heritage that a parent never provides to them. (See, e.g., *In re X.V.* (2005) 132 Cal.App.4th 794, 805 [rejecting claim that order terminating parental rights should be reversed based on information about Indian heritage that mother never shared with agency].) In these children's cases, father disclosed no information suggesting he had Indian heritage even though he was given an ICWA-020 form to fill out and was specifically asked about his heritage by the court. He argues the ICWA-020 form he filed in half sister's case should have sufficed, complaining that "[n]o one admonished [him] that any forms filed in court one day for one child . . . would not be considered for his other children." But the form he filed in these two children's cases tells parents, in bold face at the top, that "[i]f you get new information that would change your answers, you must let your attorney, all the attorneys on the case, and the social worker . . . know immediately and an updated form must be filed with the court." Even if father believed he was complying with his duty to file an updated form in these cases by filing an ICWA-020 form in half sister's case, there is no evidence that he ever notified any of the relevant parties of the new

---

[7] The Bureau also argues that we cannot consider the two documents because they are not "part of the record in this appeal," apparently referring to the fact they were not included in the clerk's transcript for this case. They were included in the clerk's transcript from half sister's case, however, and we discussed them in our previous opinion. The Bureau cites no authority to suggest we cannot consider them in this case as well.

information.  As a result, he cannot now rely on information from half sister's case to make his claim.

We recognize and agree with the principle that appellate courts should be reluctant to determine that "parental inaction" results in the forfeiture of ICWA-related claims, given that ICWA "protect[s] the interests of Indian children and tribes."[8]  (*Dwayne P. v. Superior Court* (2002) 103 Cal.App.4th 247, 251, 259-261; see, e.g., *In re B.R.*, *supra*, 176 Cal.App.4th at p. 779; *In re Marinna J.* (2001) 90 Cal.App.4th 731, 736-739.)  But this principle has limits:  a parent cannot provide specific information in one case denying Indian heritage and expect the juvenile court and county welfare agency to ferret out possible contrary information in other files in other cases, even those that are judicially noticed, when there has been no suggestion that any such contrary information exists.  If father truly discovered new information about his heritage in the 19 days between the day he gave his negative responses in these cases and the day he filed the ICWA-020 form in half sister's case, he was required to raise the issue.  Because he failed to do so, we conclude the information about his potential heritage provided in half sister's case did not give the court or Bureau reason to know the two older children might be Indian children.  As a result, the absence of an ICWA finding in their cases was also harmless.

### C.    Father Forfeited His "Statutory Framework" Claims and His Claim of Deficient Notice by Failing to File a Petition for Extraordinary Writ Review of the January 2014 or February 2014 Orders.

Father argues the juvenile court "committed reversible error when it failed throughout the dependency matter to adhere to the statutory framework provided in section 300[] et seq."  (Capitalization omitted.)  As to the two older children, he claims the court erred by failing to timely order reunification services and to ensure a case plan was provided to him and by finding that reasonable services were provided.  As to younger brother, he claims the court erred by failing to conduct a paternity inquiry or

---

[8] A case related to this issue is currently pending before our state Supreme Court.  (*In re Isaiah W.*, S221263.)

provide him with information about raising his paternity status and by bypassing reunification services. Finally, as to all three children, he argues the court erred by failing to consider their potential placement with relatives. He also claims he was denied due process because the Bureau failed to give him notice of the section 366.26 hearing (notice claim).

Father concedes that the claims would be considered forfeited if he lacked justification for failing to file petitions for extraordinary writ review of the January 2014 or February 2014 orders setting a section 366.26 hearing. But he argues that his failure to file these petitions was justified because the juvenile court failed to properly notify him of the writ requirement and his trial counsel provided ineffective assistance by not filing the petitions on his behalf. We reject father's "statutory framework" and notice claims because we conclude that father received proper notice of the writ requirement in all three cases and cannot establish that his failure to file the writ petitions was due to ineffective assistance of counsel.[9]

An order setting a section 366.26 hearing and "any [other] order, regardless of its nature, made at the hearing at which a setting order is entered" must be challenged by filing a petition for extraordinary writ review. (*In re Anthony B.* (1999) 72 Cal.App.4th 1017, 1021, 1023-1024; § 366.26, subd. (*l*); see rules 8.450, 8.452.) Generally, a party cannot challenge such orders in an appeal unless the party timely filed a petition for writ review and "[t]he petition . . . was summarily denied or otherwise not decided on the merits." (§ 366.26, subd. (*l*)(1)(A), (C), (*l*)(2).)

The failure to file a writ petition may be excused for "good cause," however, such as where the juvenile court fails to inform the party of the need to file such a petition to challenge the order setting the section 366.26 hearing. (*In re Cathina W.* (1998) 68 Cal.App.4th 716, 722-723.) After entering such an order, the court is required to

---

[9] Father also argues his trial counsel rendered ineffective assistance by failing to raise objections related to several of these claims. We need not consider this issue because we determine the claims are foreclosed by father's failure to file a writ petition, not by his failure to object below.

18

"advise all parties of the requirement of filing a petition for extraordinary writ review . . . in order to preserve any right to appeal in these issues." (§ 366.26, subd. (*l*)(3)(A).) If a party is not in court when the order is made, notice must be made "by first-class mail by the clerk of the court to the last known address" of that party. (§ 366.26, subd. (*l*)(3)(A); see also rule 5.590(b).)

In August 2012, father filed a JV-140 form, "Notification of Mailing Address," in the two older children's cases that identified a permanent mailing address in Pinole. In September 2013, father filed a JV-140 form in younger brother's case identifying a permanent mailing address in San Francisco with a zip code of 94103. The next month, he filed another JV-140 form in younger brother's case that identified the same San Francisco address except with a zip code of 94102. After the juvenile court set a section 366.26 hearing in the two older children's cases, notices of the writ requirement were mailed to father at the Pinole address. And after the court set a section 366.26 hearing in younger brother's case, notice of the writ requirement was mailed to father at the San Francisco address with a zip code of 94103.

Father argues the juvenile court failed to provide proper notice in any of the three cases because the notices should have been sent to the address on the JV-140 form filed in younger brother's case in October 2013, that is, the San Francisco address with a zip code of 94102. Father never claims, however, that he actually failed to receive any of the notices, and there is no evidence that they were returned to sender. Indeed, in his reply brief, father states that he "does not have a declaration to submit addressing whether [he] received the notice[s]." Nor does he claim he was unaware of the writ requirement, and he did not attempt to appeal from the January 2014 or February 2014 orders.

As we explained in more detail in half sister's case, under *In re T.W.* (2011) 197 Cal.App.4th 723, 730, such facts permit the inference that father received the notices. As to the notice about younger brother, father attempts to distinguish *T.W.* on the basis that it involved a missing zip code. (*Id.* at p. 729.) We fail to see how using a zip code that is off by one number makes it any less likely that mail will be delivered than not using a zip code at all. And as to the notices about sister and older brother, which were

19

mailed in January 2014, we note that father argued in half sister's appeal that the notice there, which was mailed in November 2013, should have been mailed to the same Pinole address he says should not have been used here. In any event, given father's failure to claim he did not receive the notices, there is no reason to think they did not reach him, and he therefore has not established good cause for his failure to file either writ petition.

Father's claim that his trial counsel rendered ineffective assistance by not filing a writ petition also fails. Although ineffective-assistance claims are normally raised by a petition for writ of habeas corpus because they depend on evidence outside the record, such a claim "may be reviewed on direct appeal when there is no satisfactory explanation for trial counsel's act or failure to act." (*In re N.M.* (2008) 161 Cal.App.4th 253, 270; *In re Arturo A.* (1992) 8 Cal.App.4th 229, 243.) But, just as we concluded in half sister's and half brother's cases, the obvious possible explanation for why father's trial counsel did not file a writ petition is that he did not have the required authorization from father to do so. (*Arturo A.*, at p. 243; *In re Cathina W.*, *supra*, 68 Cal.App.4th at p. 724; see also rule 8.450(e)(3).) Again, "[w]e cannot assume that the decision [not to file a writ petition] was the result of negligence, when it could well have been based upon some practical or tactical decision governed by client guidance." (*Arturo A.*, at p. 243.)

In sum, father cannot establish as to any of the three children that he failed to receive proper notice of the writ requirement or that his trial counsel provided ineffective assistance by not filing a writ petition. Therefore, his "statutory framework" and notice claims fail because, as he concedes, he did not seek appellate review of the January 2014 or February 2014 orders or any earlier orders. (See *In re Janee J.* (1999) 74 Cal.App.4th 198, 207-209; *In re Meranda P.* (1997) 56 Cal.App.4th 1143, 1150-1151 [discussing waiver rule preventing challenges to previous orders of which timely appellate review not sought].)

D.   *The Juvenile Court Had No Sua Sponte Duty to Appoint a Guardian Ad Litem for Father.*

Finally, father contends the juvenile court erred by not sua sponte appointing a guardian ad litem for him due to his mental incompetency.[10]  He also argues that his trial counsel's failure to raise the issue of competency constituted ineffective assistance of counsel.  Both claims fail because, as in half sister's and half brother's cases, the record fails to disclose any evidence that father was unable to understand or participate in the proceedings or to assist his trial counsel.

Father's claim is premised on evidence in the case involving half sister.  The detention/jurisdiction report in that case stated that while father was a dependent child, he "was placed in high level residential treatment programs" and was diagnosed with "PTSD, Depressive Disorder, and Oppositional Defiant Disorder."  The six- and twelve-month status-review report provided further details:  father "had a mental health conservator" from the time he was 14 years old until the time he emancipated in 2003, when he was almost 19 years old.  "The recommendation was that [father] continue[] to be under the care of a conservator even after he emancipated," but "the continued conservatorship was not pursued" because father was living on the East Coast when he emancipated.

"Code of Civil Procedure section 372 provides that in any proceeding in which an incompetent person is a party, that person shall appear by a guardian ad litem appointed by the court in which the action is pending." (*In re Sara D.* (2001) 87 Cal.App.4th 661, 665; Code of Civ. Proc., § 372, subd. (a).)  A person may be found incompetent under either Penal Code section 1367, which applies to criminal defendants, or Probate Code section 1801, which applies to conservatees.  In the dependency context, the key question in determining whether an adult parent requires a guardian ad litem is "whether the parent has the capacity to understand the nature or consequences of the proceeding and to assist

---

[10] For the same reasons we gave in half sister's case, father's failure to file a writ petition does not foreclose this claim.  (See *In re A.C.* (2008) 166 Cal.App.4th 146, 156-157; *In re M.F.* (2008) 161 Cal.App.4th 673, 681-682.)

21

counsel in preparing the case." (*In re James F.* (2008) 42 Cal.4th 901, 910; *Sara D.*, at p. 667.)

"When a dependency court has knowledge of a party's . . . incompetence under [Code of Civil Procedure] section 372, the dependency court has an obligation to appoint a [guardian ad litem] sua sponte." (*In re A.C.*, *supra*, 166 Cal.App.4th at p. 155.) We review the failure to appoint a guardian ad litem for an abuse of discretion. (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1366-1367; see also *In re Christopher I.* (2003) 106 Cal.App.4th 533, 568.)

Assuming, without deciding, that the information about father's mental health disclosed in half sister's case could ever give rise to a duty to appoint a guardian ad litem in these three children's cases, we conclude, as we did in her case, that that information did not trigger the juvenile court's sua sponte duty to appoint a guardian ad litem. Information about father's mental-health issues and his earlier conservatorship did not require appointment of a guardian ad litem absent an indication that father was unable to understand the proceedings or assist his trial counsel. (*In re Ronell A.*, *supra*, 44 Cal.App.4th at pp. 1367-1368; *In re R.S.* (1985) 167 Cal.App.3d 946, 979.) Here, father appeared at multiple hearings, during which he apparently acted normally and responded appropriately when questioned. And once again, his trial counsel (the same attorney in all five cases) did not raise any concerns about his competency. As the records in these children's cases and half sister's case fail to disclose any evidence that father was unable to participate in or understand the proceedings, we conclude the juvenile court did not abuse its discretion by not sua sponte appointing a guardian ad litem for him.

Father's claim of ineffective assistance of counsel similarly fails. As mentioned above, such claims "may be reviewed on direct appeal when there is no satisfactory explanation for trial counsel's act or failure to act." (*In re N.M.*, *supra*, 161 Cal.App.4th at p. 270.) Here, given the lack of evidence that father was unable to participate in or understand the proceedings, his trial counsel may have reasonably believed that father

22

was competent, and father therefore cannot establish he received ineffective assistance based on counsel's failure to raise the issue of his competence.

### III.
### DISPOSITION

The orders terminating parental rights to L.D.C., D.C., Jr., and L.C. are affirmed.


_____
Humes, P.J.


We concur:


_____
Margulies, J.


_____
Banke, J.